## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| WILLIAM MONTGOMERY, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br> v.<br><br>STANLEY BLACK & DECKER, INC., d/b/a CRAFTSMAN,<br><br>      Defendant. | CASE NO. _____<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Plaintiff William Montgomery brings this action on behalf of himself and all others similarly situated against Defendant Stanley Black & Decker, Inc., d/b/a Craftsman ("Craftsman" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.  This is a putative class action lawsuit regarding Defendant's false and misleading labeling and packaging of Craftsman-brand wet/dry vacuums (collectively, the "Vacuums," as enumerated below).  The labeling and packaging of the Vacuums are replete with false and misleading horsepower ("HP") claims, namely that the Vacuums purportedly produce "1.75 Peak HP," "2.0 Peak HP," "2.5 Peak HP," "3.0 Peak HP," "3.5 Peak HP," "4.0 Peak HP," "4.25 Peak HP," "5.0 Peak HP," "5.5 Peak HP," "6.0 Peak HP," or "6.5 Peak HP" (collectively, the "HP Claims").  Defendant misleads consumers into believing that the Vacuums can in fact generate the claimed horsepower, even though these claims are illusory and can never be obtained in

actual use.  By doing so, Defendant is able to charge a substantial price premium for its Vacuums on account of these fictitious HP Claims.

2.      It is physically impossible for any of the Vacuums to achieve a horsepower output anywhere close to Defendant's HP Claims.  The true horsepower of the Vacuums is only a small fraction of the HP Claims.  Given the wattages and amperages of the Vacuums, and pursuant to testing performed by Underwriters Laboratories ("UL"), a prestigious third-party laboratory specializing in electrical appliances with whom Defendant collaborated prior to the sale of the Vacuums, the total electrical power input possible at any instance for the "5 Peak HP" model is only 1200 watts.[1]  If the electrical power is perfectly converted by the Vacuums' motors, which it is not, the total possible output power of the "5 Peak HP" models is only about <u>1.609 horsepower</u> (one horsepower equals about 745.7 watts).  This is <u>67.8% below</u> the claimed "5 Peak HP."  As another example, the total electrical power input possible at any instance for the "6.0 Peak HP" models is only 1260 watts, or about <u>1.689 horsepower</u>.  This is <u>71.8% below</u> the claimed "6.0 Peak HP."  In fact, the standard NEMA 5-15 receptacles (*i.e.*, 3-prong wall outlets) found in American homes, and the NEMA 5-15 plugs (*i.e.*, 3-prong plugs) found on the Vacuums, are never rated for more than 1800 watts and 0.5 horsepower, respectively.  Thus, Defendant's HP Claims are unobtainable, under any conditions.

3.      Defendant labeled the Vacuums with false and misleading horsepower ratings because such representations are highly material to consumers and serve to differentiate the Vacuums from competitors' vacuums.  Here, consumers relied on Defendant's horsepower claims, but only received a small fraction of the horsepower promised and expected.  Consumers, when purchasing their Vacuums, relied on Defendant's HP Claims to determine the strength and

---

[1] The marked amperage is the electrical power the device draws, even in the "most severe conditions of normal use [that] is not a deliberate overload."  Even with a 10% underestimate that the UL allows, the horsepower output is significantly below the representation on the products' labeling and packaging. *See infra.*

suction ability of their Vacuums compared to others.  This number, which a reasonable consumer assumes is correct, forms a substantial basis of his or her bargain, and in turn allows Defendant to command a price premium for the Vacuums over comparable models.  The higher the horsepower number, the more likely a consumer is to purchase the vacuum over another model, and the more money a consumer is willing to spend.

4.     Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of Defendant's products, for: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) unjust enrichment; (iv) negligent misrepresentation; (v) fraud; (vi) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.* ("CUTPA"); and (vii) violation of the Virginia Consumer Protection Act, §§ 59.1-200, *et seq.* ("VCPA").

## THE PARTIES

5.     Plaintiff William Montgomery is a citizen of Virginia, residing in Virginia Beach, Virginia.  In November or December of 2018, Plaintiff Montgomery purchased a Craftsman-brand vacuum, specifically the "Craftsman 16 Gallon Wet/Dry Vac" with "5.0 Peak HP," Model No. CMXEVBCPC1650, from a Lowe's retail store in Virginia Beach, Virginia.  Prior to his purchase of his Craftsman vacuum, Plaintiff Montgomery reviewed the product's labeling and packaging and saw that the vacuum purportedly had a horsepower rating of "5 Peak HP." Plaintiff Montgomery relied on that labeling and packaging to choose his vacuum over comparable models.  Plaintiff Montgomery saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that his Craftsman vacuum was capable of producing the claimed "5 Peak HP" during normal use and operation.  Plaintiff Montgomery relied on these representations and warranties in deciding to purchase his

3

Craftsman vacuum.  Accordingly, these representations and warranties were part of the basis of the bargain, in that he would not have purchased his Craftsman vacuum on the same terms had he known these representations were not true.  In making his purchase, Plaintiff Montgomery paid a substantial price premium due to the false and misleading HP Claims.  However, Plaintiff Montgomery did not receive the benefit of his bargain, because his Craftsman vacuum, in fact, does not produce anywhere near 5 horsepower.  Plaintiff Montgomery also understood that in making the sale, his retailer was acting with the knowledge and approval of the Defendant and/or as the agent of the Defendant.  Plaintiff Montgomery further understood that the purchase involved a direct transaction between himself and Defendant, because the purchase came with Defendant's representations and warranties that his Craftsman vacuum produced 5 horsepower.

6. Defendant Stanley Black & Decker, Inc., is a Connecticut corporation, with its principal place of business at 1000 Stanley Drive, New Britain, Connecticut 06053.  Stanley Black & Decker manufactures, sells, and distributes Craftsman-brand products, and is responsible for the advertising, marketing, trade dress, and packaging of Craftsman wet/dry vacuums, including the Vacuums at issue in this matter.  Stanley Black & Decker manufactured, marketed, and sold the Vacuums during the class period.  The planning and execution of the advertising, marketing, labeling, packaging, testing, and/or corporate operations concerning the Vacuums and the HP Claims was primarily carried out at Stanley Black & Decker's headquarters and facilities within Connecticut, as is most, or all, of the Vacuums' manufacturing and assembly.

7. The Vacuums at issue include all Craftsman models that purport to have "1.75 Peak HP," "2.0 Peak HP," "2.5 Peak HP," "3.0 Peak HP," "3.5 Peak HP," "4.0 Peak HP," "4.25 Peak HP," "5.0 Peak HP," "5.5 Peak HP," "6.0 Peak HP," or "6.5 Peak HP:"

A.  Vacuums labeled as having "1.75 Peak HP" or greater in the "Light-Duty" category including:  "Craftsman 2.5 Gallon Portable Wet/Dry Vac" and "Craftsman 6 Gallon Portable Wet/Dry Vac;"

B.  Vacuums labeled as having "2.0 Peak HP" or greater in the "Heavy Duty" category including:  "Craftsman 2.5 Gallon Wall-Mounted Wet/Dry Vac," "Craftsman 12 Gallon Wet/Dry Vac," "Craftsman 16 Gallon Wet/Dry Vac," and "Craftsman 20 Gallon Wet/Dry Vac;"

C.  Vacuums labeled as having "3.0 Peak HP" or greater in the "Stainless Steel" category including:  "Craftsman 5 Gallon Stainless Steel Wet/Dry Vac" and "Craftsman 8 Gallon Stainless Steel Wet/Dry Vac;"

D.  Vacuums labeled as having "3.0 Peak HP" or greater in the "Ash Vacuum" category including:  "Craftsman 5 Gallon Ash Vacuum;"

E.  Vacuums labeled as having "3.5 Peak HP" or greater in the "Workshop" category including:  "Craftsman 6 Gallon Wet/Dry Vac" and "Craftsman 9 Gallon Wet/Dry Vac;"

F.  Vacuums labeled as having "4.0 Peak HP" or greater in the "Medium Duty" category including:  "Craftsman 9 Gallon Wet/Dry Vac," "Craftsman 4 Gallon Portable Wet/Dry Vac," and "Craftsman 5 Gallon Wall-Mounted Cleaning System;" and

G.  Vacuums labeled as having "5.5 Peak HP" or greater in the "Extreme Suction Performance" ("XSP") category including:  "Craftsman XSP 12 Gallon Wet/Dry Vac," "Craftsman XSP 16 Gallon Wet/Dry Vac," and "Craftsman XSP 20 Gallon Wet/Dry Vac."

8.      Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from Defendant.

10.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  Also, Defendant is incorporated and is headquartered in this District.  Moreover, Defendant distributed, marketed, advertised, and sold the Vacuums to retailers and class members, which are the subject of the present complaint, from its headquarters in this District.

## FACTS COMMON TO ALL CLAIMS

### A.  The Vacuums Are Uniformly Labeled With HP Claims Ranging Between "1.75 Peak HP" To "6.5 Peak HP"

11.      The Vacuums are uniformly labeled, packaged, marketed, and advertised with the HP Claim, which are representations of horsepower ratings ranging between "1.75 Peak HP" to "6.5 Peak HP."

12.      On online retailers' websites, the HP Claims are uniformly and prominently featured for the Vacuums.  For instance, Amazon.com lists Defendant's HP Claims for the

following Vacuums to allow consumers to make a comparative assessment of the various

Craftsman wet/dry vacuums available on the market in deciding which product to purchase:[2]



[2] https://www.amazon.com/dp/B007C6KT3I/ref=emc_b_5_t (accessed 7/31/2019);
https://www.amazon.com/dp/B07MBHCZ5S/ref=emc_b_5_t (accessed 7/31/2019).

13.     As another example, the Lowe's website sells the "Craftsman 16-Gallon 5-HP Shop Vacuum," with a HP Claim of  "5-HP" in the product name, as well as in the "Product Information" section under the first sub-heading entitled "Description:" [3]



14.     These same representations are incorporated into Defendant's packaging, labeling, and advertising for the Vacuums, as seen below in retail packaging on shelves at Ace Hardware and Lowe's:



15.    Furthermore, Defendant included the HP Claims directly on many of the

Vacuums themselves:



16.    However, these HP Claims are false and misleading, as the actual operating power

and functionality of the Vacuums, under any condition, is only a small fraction of these

representations.  For instance, Defendant's HP Claims for the following Vacuums are

exaggerated by approximately <u>60-85%</u>:

| HP Claim | Actual Max HP | % Difference | Amperage, in Amps (at 120V) | Max Watts (*i.e.*, Amps times 120V) |
|---|---|---|---|---|
| 1.75 | **0.483** | **-72.4%** | 3.0 amps | 360 watts |
| 3.5 | **1.207** | **-65.5%** | 7.5 amps | 900 watts |
| 4.0 | **1.529** | **-61.8%** | 9.5 amps | 1140 watts |

| HP Claim | Actual Max HP | % Difference | Amperage, in Amps (at 120V) | Max Watts (*i.e.*, Amps times 120V) |
|---|---|---|---|---|
| 4.25 | **1.336** | **-68.6%** | 8.3 amps | 996 watts |
| 5.0 (Model No. CMXEVBE17925)[4] | **0.805** | **-83.9%** | 5.0 amps | 600 watts |
| 5.0 (Model No. CMXEVBE17612) | **1.207** | **-75.9%** | 7.5 amps | 900 watts |
| 5.0 (Model No. CMXEVBCPC1650) | **1.609** | **-67.8%** | 10 amps | 1200 watts |
| 6.0 | **1.690** | **-71.8%** | 10.5 amps | 1260 watts |
| 6.5 | **1.931** | **-70.3%** | 12.0 amps | 1440 watts |

**B.   Horsepower Is A Uniformly Understood And Defined Measure Of Power**

17.     Horsepower is a common measure of the work power, or power output, of a device.  Both normal consumers and technical experts understand and use horsepower as a standard unit of measurement for determining the work power of a particular device.  The definition of 1 horsepower converted to electric terms is 745.7 watts.  For example, the equivalent of 2.5 horsepower is 1865 watts, and 6.5 horsepower is 4849 watts.  For an electrical device to output a particular work power, the device must draw, or input, an equivalent power from an electrical source such as a wall outlet or circuit.[5]

**C.   Household Circuits In The United States Are Limited To A Particular Total Power Output In Watts**

18.     Similar to a narrow pipe that limits the flow of water, wiring size limits the amount of electricity that can flow before the wire heats up and potentially catches fire.  As such,

---

[4] Defendant manufactures three different Vacuums purporting to have "5.0 Peak HP," but all three products list different amperages and the "Actual Max HP" is therefore different for each product.  In order of appearance, the Vacuums with 5.0 HP Claims listed below refer to the following products: Model No. CMXEVBE17925 refers to "Craftsman 5 Gallon Wall-Mounted Cleaning System;" Model No. CMXEVBE17612 refers to "Craftsman 4 Gallon Portable Wet/Dry Vac;" and Model No. CMXEVBCPC1650 refers to "Craftsman 16 Gallon Wet/Dry Vac."
[5] Real world devices and circuitry are inefficient, and the work power for a device will always be less than the electric power input due to losses.  *See infra.*  That said, the calculations in this complaint are highly conservative and over-estimate available power.

in the United States, residential and commercial wiring is strictly and uniformly regulated. Residential circuits are normally limited to 15 amps in 120V circuits which means that the total wattage (power) available from a standard wall outlet is 1800 watts (*i.e.*, 120V times 15 amps).[6] If a device, or a short circuit, tries to pull more power than the rating, a breaker (fuse) will cut power to the entire circuit.

19.     These power ratings are for the circuit as a whole.  However, in ordinary use, there may be other devices connected and using power, which would further reduce the amount of power for the vacuum before blowing the breaker (fuse).

20.     In the interest of simplicity, and as noted further in the Complaint, the power limit of 1800 watts from a household circuit is grossly exaggerated from actual use because it does not consider efficiency losses in the wiring, motor, or other sources which would reduce the wattage capabilities of the device considerably.[7]  As such, the calculations in this Complaint are highly conservative and over-estimate available power.  Even so, Defendant's Vacuums in fact only deliver a small fraction of the claimed amount.

## D.   <u>Household Receptacles In The United States Are Limited To A Particular Total Power Output In Watts</u>

21.     The vast majority of household receptacles (outlets) in the United States are standardized NEMA 5-15, or equivalent, as defined by National Electrical Manufacturers

---

[6] Some circuits in the United States offer 20 amps, which would be equivalent to 2400 watts of power.  These circuits are normally for use by permanent high-draw devices such as refrigerators and have a different plug and receptacle (NEMA 5-20), which is not found on the Vacuums.  In any case, the power specifications for the Vacuums, even ones with the highest claim of "6.5 Peak HP," do not exceed 12 amps by Defendant's own ratings in use on the labeling and packaging.

[7] Electric motors are commonly between 50-90% efficient in converting electric power to work power (horsepower), depending on the load, type, quality, design, and construction of the motor, wiring, circuity, and device.

Association ("NEMA").[8]  NEMA 5-15 plugs and receptacles are limited to 15 amps at 120V, and

thus 1800 watts.[9]  All of the Vacuums are sold with NEMA 5-15 plugs.

22.     Additionally, manufacturers, along with NEMA and the American National

Standards Institute ("ANSI"),[10] routinely publish maximum horsepower ratings for standardized

receptacles.  Not a single 15 amp receptacle has a rating above 0.5 horsepower.

23.     It is unsafe for a device to use more power than the receptacle it is designed for.

As such, manufacturers, including Defendant, could not design a vacuum that would draw more

power than a household outlet is designed to provide.

### E.  Defendant States Contradictory Wattages And Amperages Which Show That The Advertised Horsepower Cannot Be True

24.     In Defendant's brochures, user manuals for the Vacuums, and on the appliances

themselves, values for wattage and amperages are stated.[11]  For example, in connection with

vacuums marked as "6.5 Peak HP," Defendant uniformly lists a wattage of 1440, which equals

12 amps at 120V:[12]

| Item model number | CMXEVBE17595 |
| --- | --- |
| Size | 16 Gallon 6.5 Peak HP |
| Voltage | 120 volts |
| Wattage | 1440 watts |

25.     This is significantly less than the 4849 watts a true 6.5 horsepower motor

requires.  As another example, Vacuums marked as "3.5 Peak HP" are listed at 7.5 amps at

---

[8] NEMA is the largest trade association of electrical equipment manufacturers in the United States and sets standards for electrical equipment throughout the United States.

[9] For 20 amp circuits NEMA 5-20 plugs and receptacles, or equivalent, are used.  However, Defendant's own power ratings for the Vacuums do not exceed 12 amps at 120V and the Vacuums have NEMA 5-15 plugs.

[10] ANSI (American National Standards Institute) is one of the largest standardization organizations in the world with over 125,000 company members and 3.5 million members.

[11] This amperage is also verified by the UL and is permanently marked on all the Vacuums.  *See infra*.

[12] https://www.amazon.com/dp/B07H84CNG9/ref=emc_b_5_t (accessed 7/31/19).

120V, which means these Vacuums use a maximum of 900 watts (*i.e.*, 7.5 amps times 120V). This is significantly less than the 2610 watts a 3.5 horsepower motor requires.

26.     The above calculation and comparison can be easily calculated for every model Vacuum, with one, uniform answer: the Vacuums do not – and cannot – produce the claimed horsepower.

### F.   UL Is A Highly Reputable Safety Certification Organization, And UL Certification Is All But Required To Sell Electrical Products In The United States

27.     Federal laws and governmental regulatory agencies such as OSHA, state and local laws, common distribution and purchasing contracts, and potential safeguards against tort liability, all but require product manufacturers and distributors, such as Defendant, to test their devices with a National Registered Testing Laboratory ("NRTL") for safety.  The most common and ubiquitous NRTL is UL LLC (formally known as Underwriters Laboratories) ("UL"), a non-profit and federally approved NRTL.

28.     UL, as an independent third-party organization, tests millions of products a year in almost every industrial and consumer product category for safety.  UL creates and sets standards for particular components, such as wiring, as well as "UL Standard[s]" for entire product categories.  A UL Standard is a standardized testing regime formulated for a particular type of similar products to ensure uniform safety for all devices.  When a device is sent to the UL, and it passes the rigorous tests, the device becomes "UL Listed."  The company can then put the UL mark on its product to show the certification.  As well, the company can sell the device in jurisdictions requiring the certification (nearly the entire US market has some type of schema requiring a NRTL, such as UL, certification).

29.     One such UL Standard is "UL 1017 STANDARD FOR SAFETY Vacuum Cleaners, Blower Cleaners, and Household Floor Finishing Machines."  According to UL

listings, the product packaging, and labeling, all of the models in every series of the Vacuums are uniformly UL listed and marked, and thus tested under UL 1017.

### G. "UL 1017 STANDARD FOR SAFETY Vacuum Cleaners, Blower Cleaners, And Household Floor Finishing Machines" Has Particular Safety Tests That Limit The Wattage And Amperage

30.     UL 1017 tests a vacuum being certified in numerous testing conditions that mimic the most extreme real-world operating scenarios.  For instance, UL 1017 5.2 tests vacuums in conditions of "[n]ormal load [which] shall be considered to be that load which approximates as closely as possible the most severe conditions of normal use but is not a deliberate overload."

31.     As well, UL 1017 5.7 dictates a "Rating" requirement which requires the "input current in amperes (and watts, if so marked) to the appliance shall not vary from the marked current (and wattage) rating by more than plus 10% and minus 15% when the equipment is operated under normal load[13] conditions."  This means that the highest power the device can ever draw, even in the "most severe conditions of normal use [that] is not a deliberate overload," has been tested and confirmed by the UL to be not more than 10% of the previously mentioned wattage and amperage Defendant permanently stamps all of its products with.[14]

### H. Defendant Intentionally Mislabeled The Vacuums With False And Misleading HP Claims

32.     By permanently marking the Vacuums with the UL-verified wattages and amperages, and publishing the wattages and amperages in its brochures, Defendant knew that the

---

[13] UL dictates the normal load conditions are the "most severe conditions of normal use but is not a deliberate overload."

[14] The starting current for an electric motor is also one of the highest draw scenarios.  UL 1017 5.6, in short, requires that "[a]n appliance shall start and operate normally on a circuit protected by an ordinary … fuse having a current rating corresponding to that of the branch circuit to which the appliance should be connected … and the fuse … shall not trip."  Because the Vacuums are all designed and marked to operate on 120V at less than 15 amps, even at start, the Vacuums cannot pull more 1800 watts (i.e., 120V times 15 amps), which is less than the 1865 watts even a 2.5 horsepower motor requires.

HP Claims were false and misleading, yet nonetheless still advertised, labeled, and packaged the Vacuums with the exaggerated horsepower claims.

33.    The Vacuums do not, and will never be able to, meet the power requirements required for the Vacuums' advertised horsepower, as is demonstrated by:  (1) the inability for household circuits to provide the necessary power required to meet the HP Claims; (2) the inability for household receptacles to provide the necessary power required to meet the HP Claims; (3) Defendant's own wattages and amperages not meeting the power requirements necessary for the HP Claims; (4) UL testing, certification, and marking demonstrating the maximum operating power of the device, under any conditions, does not meet the necessary power required to meet the HP Claims.

34.    Simply put, Defendant's horsepower claims are a farce.  It is physically impossible for any consumer to experience and use the claimed horsepower of the Vacuums during use, under any conditions.  The true horsepower rating is only a small fraction of what is depicted on Defendant's labeling and packaging.

## CLASS ACTION ALLEGATIONS

35.    Pursuant to Fed. R. Civ. P. 23, Plaintiff seeks to represent a class defined as all persons in the United States who purchased a Craftsman brand vacuum with a 1.75 or greater HP claim (the "Class").  Excluded from the Class are persons who made such purchase for the purpose of resale.

36.    Plaintiff also seeks to represent a subclass of all Class members who purchased the Vacuums in Virginia (the "Virginia Subclass" or "Subclass").

37.    Members of the Class and Virginia Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Virginia

Subclass number in the tens or hundreds of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

38.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to: whether the HP Claims are false or misleading; whether Defendant warranted the horsepower claim on the packaging and labeling; whether Defendant breached these warranties; and whether Defendant committed statutory and common law fraud by doing so.

39.     The claims of the named Plaintiff are typical of the claims of the Class and Virginia Subclass in that the named Plaintiff purchased a Craftsman vacuum in reliance on the representations and warranties described above, and suffered a loss as a result of those purchases.

40.     Plaintiff is an adequate representative of the Class and Virginia Subclass because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

41.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class and Virginia Subclass members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial

system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

<u>COUNT I</u>
(**Breach Of Express Warranty**)

42.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

43.    Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendant.

44.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted in the HP Claims that the Vacuums output between "1.75 Peak HP" to "6.5 Peak HP."

45.    In fact, the Vacuums do not, and cannot, output the horsepower in the HP Claims.

46.    As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and the Class have been injured and harmed because:  (a) they would not have purchased the Vacuums on the same terms if they knew that the HP Claims were not true; (b) they paid a price premium for the Vacuums due to the HP Claims; and (c) the Vacuums do not have the characteristics, uses, benefits, or quantities as promised in that the claimed HP can never be achieved in actual use.

## COUNT II
### (Breach Of The Implied Warranty Of Merchantability)

47.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

48.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendant.

49.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, affixed HP Claims to each Vacuum and impliedly warranted that the Vacuums output "1.75 Peak HP" to "6.5 Peak HP."

50.     Defendant breached the warranty implied in the contract for the sale of the Vacuums because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because the Vacuums do not, and in fact, could never output the horsepower claimed during use by Class members as advertised.  As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

51.     Plaintiff and Class members purchased the Vacuums in reliance upon Defendant's skill and judgment and the implied warranties.

52.     The Vacuums were not altered by Plaintiff and Class members.

53.     The Vacuums were defective when they left the exclusive control of Defendant.

54.     Defendant knew that the Vacuums would be purchased and used without additional testing by Plaintiff and Class members.

55.     The Vacuums were defectively designed and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

56.     As a direct and proximate cause of Defendant's breach of the implied warranty Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the Vacuums on the same terms if they knew that the HP Claims were not true; (b) they paid a price premium for the Vacuums due to the HP Claims; and (c) the Vacuums do not have the characteristics, uses, benefits, or quantities as promised in that the claimed HP can never be achieved in actual use.

### COUNT III
**(Unjust Enrichment)**

57.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

58.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendant.

59.     Plaintiff and Class members conferred benefits on Defendant by purchasing the Vacuums.

60.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchases of the Vacuums.  Retention of those monies under these circumstances is unjust and inequitable because Defendant misrepresented in the HP Claims that the Vacuums output between "1.75 Peak HP" to "6.5 Peak HP."  These misrepresentations caused injuries to Plaintiff and Class members because they would not have purchased the Vacuums at all, or on the same terms, if the true facts were known.

61.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and Class members for its unjust enrichment, as ordered by the Court.

## COUNT IV
### (Negligent Misrepresentation)

62.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

63.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendant.

64.     As discussed above, Defendant misrepresented that the Vacuums output between "1.75 Peak HP" to "6.5 Peak HP" by virtue of the HP Claims.  Defendant had a duty to disclose the proper horsepower rating rather than misrepresented information.

65.     At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

66.     At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Vacuums, namely their true horsepower.

67.     The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Vacuums.

68.     Plaintiff and Class members would not have purchased the Vacuums if the true facts about the HP Claims had been known.

69.     The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT V
### (Fraud)

70.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

71.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendant.

72.     As discussed above, Defendant provided Plaintiff and Class members with false and/or misleading material information and failed to disclose material facts about the Vacuums, including but not limited to the fact that they do not, and cannot, output the claimed "1.75 Peak HP" to "6.5 Peak HP."  These misrepresentations and omissions were made with knowledge of their falsehood.

73.     The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Vacuums.

74.     The fraudulent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VI
### (Violation Of The Connecticut Unfair Trade Practices Act,
### Conn. Gen. Stat. §§ 42-110a, *et seq.*)

75.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

76.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

77.     Defendant is a "person" under Connecticut General Statute § 42-110a(3).

78.     Defendant is engaged in "trade" and "commerce" under Connecticut General Statute § 42-110a(4) because it sells and distributes the Vacuums to consumers within this state and also directs and controls the labeling, marketing, and advertising of the Vacuums from its headquarters within this state.

79.     The CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  Defendant's conduct as described herein is part of a general business practice that constitutes unfair competition and unfair and deceptive acts in violation of CUTPA.

80.     In the course of business, Defendant deliberately and knowingly misrepresented that the Vacuums can generate up to 6.5 horsepower, even though the HP Claims are illusory and can never be obtained in actual use.

81.     Given that the HP Claims are, under any condition, unobtainable in actual use, Defendant knew or should have known that the HP Claims labeled and advertised on the Vacuums were false.  However, Defendant failed to disclose this material fact to Plaintiff and the Class members at the time of purchase.

82.     Defendant's misrepresentations regarding the Vacuums were material to reasonable consumers and were likely to deceive reasonable consumers, including Plaintiff and the Class, about the true nature of the Vacuums that Defendant manufactures, labels, markets, advertises, sells, and distributes.

83.     Defendant intended that Plaintiff and the Class members rely on the HP Claims, so that they would purchase the Vacuums.

84.     Accordingly, Defendant has engaged in unfair and deceptive trade practices in violation of the CUTPA, including representing that the Vacuums have characteristics, uses, benefits, and qualities which they do not have; representing that the Vacuums are of a particular standard and quality when they are not; advertising Vacuums with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, Defendant's acts and practices described herein offend established public policy because of the harm they cause to consumers, other sellers and manufacturers of products, and because Defendant fraudulently concealed the defective nature of the Vacuums from consumers.

85.     As a direct and proximate result of Defendant's violation of the CUTPA, Plaintiff and the Class members have suffered substantial and ascertainable loss of money or property because:  (a) they would not have purchased the Vacuums on the same terms if they knew that the Vacuums had been falsely labeled as alleged herein; (b) they paid a price premium compared to products without the misrepresentations alleged herein; and (c) the Vacuums did not have the characteristics, uses, or benefits promised in that the claimed HP can never be achieved in actual use.

86.     Furthermore, as a direct result of Defendant's unfair competition and unfair and/or deceptive acts or practices, Defendant has reaped ill-gotten profits and gains, which it otherwise would not have received and which, in equity, it should be required to disgorge.

87.     By reason of the foregoing, Defendant is liable to Plaintiff and the Class for the actual damages that they have suffered as a result of Defendant's actions, and for an award of punitive damages, attorneys' fees and costs, injunctive relief precluding Defendant from continuing its unfair practices, declaratory relief, and any other just and proper relief available under the CUTPA.

## COUNT VII
### (Violation Of The Virginia Consumer Protection Act, §§ 59.1-200, *et seq.*)

88.      Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

89.      Plaintiff brings this claim individually and on behalf of the proposed Virginia Subclass against Defendant.

90.      Defendant is a "supplier" as defined by VCPA § 59.1-198, in that Defendant is a seller, lessor, licensor, or professional who "advertises, solicits, or engages in consumer transactions, or a manufacturer, distributor or licensor who advertises and sells, leases, or licenses good or services to be resold … in consumer transactions."

91.      The sale of the Vacuums to the Plaintiff and the Virginia Subclass constitute "consumer transaction[s]" as defined by VCPA § 59.1-198, in that the Vacuums were "advertised, sold or offered for sale to the Plaintiff, to be used primarily for personal, family or household purposes."

92.      The subject transaction is regulated by the VCPA.

93.      VCPA § 59.1-200(14) provides that it is unlawful for a supplier to use "any other deception, fraud, false pretense, false promise, or misrepresentation" in connection with a consumer transaction.

94.      Per VCPA § 59.1-200(5) Defendant "misrepresent[ed] that goods or services had certain quantities, characteristics, ingredients, uses, or benefits" by advertising the HP Claims when Defendant knew the HP Claims were false.

95.      Per VCPA § 59.1-200(6) Defendant "misrepresent[ed] that goods or services are of a particular standard, quality, grade, style, or model" by advertising the HP Claims when Defendant knew the HP Claims were false.

96.     Per VCPA § 59.1-200(8) Defendant "advertised goods or services with intent not to sell them as advertised" by selling the Vacuums while advertising a HP Claim and not selling the Vacuums with the horsepower claimed.

97.     Per VCPA § 59.1-200(14) Defendant used "deception, fraud, false pretense, false promise, [and] misrepresentation in connection with a consumer transaction" by deceiving Plaintiff and the Virginia Subclass with inaccurate HP Claims when Defendant knew that the HP Claims were false.  As such, Defendant's actions were willful and intentional and induced the purchases by Plaintiff and the Virginia Subclass.

98.     Plaintiff and the Virginia Subclass relied on the HP Claims and would not have purchased the Vacuums had they known the true horsepower output, or at least would not have purchased under the same terms.  Plaintiff and the Virginia subclass would have purchased, or were diverted from, another competitor's vacuum because of the HP Claims.

99.     Plaintiff and the Virginia Subclass relied upon these representations, and purchased the Vacuums based on the representations that the Vacuums had a particular horsepower as stated in the HP Claims.

100.    Plaintiff and the Virginia subclass suffered an actual loss as a result of the purchase in that the value of the Vacuums purchased, with a lower horsepower than the false HP Claims, is substantially lower than the value of the Vacuums if the HP Claims were true.

101.    As a result of Defendant's violations, Plaintiff and members of the Virginia Subclass have suffered damages because:  (a) they would not have purchased Defendant's Vacuums on the same terms if they knew that the Vacuums did not output the HP Claimed; (b) they paid a price premium for the Vacuums due to Defendant's promises that Vacuums output the claimed horsepower; and (c) Defendant's Vacuums do not have the characteristics,

uses, qualities, benefits, or quantities as promised in that the claimed HP can never be achieved in actual use.

102.     Because Plaintiff suffered a loss as a result of Defendant's violation of the VCPA, Plaintiff and the Virginia Subclass are entitled to recover all actual damages, including but not limited to, (1) the difference in the value of the Vacuums as sold and vacuums with the actual HP Claims; (2) the entire amount of the sales transaction, and all other actual damages proven at trial times three, plus attorneys' fees and the cost of bringing this action.

103.     On behalf of himself and the Virginia Subclass, Plaintiff seeks damages and/or rescission, equitable and/or injunctive relief, and also seeks equitable and declaratory relief, together with a reasonable counsel or attorneys' fees, and such other relief as the Court may deem necessary or appropriate to remedy these violations.

104.     Specifically, Plaintiff seeks to recover, on behalf of himself and other members of the Virginia Subclass, his actual damages or $500, whichever is greater, as well as his reasonable attorneys' fees and court costs.  Since Defendant's violation of the VCPA was willful, Plaintiff also seeks to recover, on behalf of himself and other members of the Virginia Subclass, three times his actual damages or $1,000, whichever is greater, as well as his attorneys' fees and court costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     For an order certifying the nationwide Class and the Virginia Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as a representative of the Class and Virginia Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Virginia Subclass members;

b.     For an order declaring the Defendant's conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiff, the nationwide Class, and the Virginia Subclass on all counts asserted herein;

d.   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of equitable monetary relief;

g.   For injunctive relief as pleaded or as the Court may deem proper; and

h.   For an order awarding Plaintiff, the Class, and Virginia Subclass their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated:  August 1, 2019                    Respectfully submitted,

**REARDON SCANLON LLP**

By:   */s James J. Reardon, Jr.*
         James J. Reardon, Jr.

James J. Reardon, Jr. (CT 13802)
45 South Main Street, 3rd Floor
West Hartford, CT  06107
Telephone: (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III*
Neal J. Deckant*
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:  fklorczyk@bursor.com
              ndeckant@bursor.com

*Pro Hac Vice* Forthcoming

*Attorneys for Plaintiff*